IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No.  7:10-CV-24-D

PAULA J. GABRIELE, )
  )
    Plaintiff, )
  )
v. )
  )  **MEMORANDUM &**
  )  **RECOMMENDATION**
MICHAEL J. ASTRUE, )
Commissioner of Social )
Security, )
  )
    Defendant. )
_____ )

      This matter is before the Court upon the parties' cross Motions for Judgment on the Pleadings (DE's 53 & 57).  The time for the parties to file any further responses or replies has expired.  Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation (DE-59).  For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-53) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-57) be GRANTED, and that the final decision by Defendant be AFFIRMED.

**<u>Statement of the Case</u>**

      Plaintiff applied for Disability Insurance Benefits ("DIB") on March 31, 2006, alleging that she became unable to work on October 1, 2005   (Tr. 20).  This application was denied initially and upon reconsideration   (Tr. 20).  A hearing was held before an Administrative Law Judge

("ALJ"), who determined that Plaintiff was not disabled during the relevant time period in a decision dated March 28, 2008 (Tr. 20-28). The Social Security Administration's Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on December 11, 2009, rendering the ALJ's determination as Defendant's final decision (Tr. 1-5). Plaintiff filed the instant action on March 3, 2010 (DE-4).

**Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> *Id.*

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, . . . [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute . . . [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453,

2

1456 (4th Cir.1990).

**<u>Analysis</u>**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

> <u>Mastro v. Apfel</u>, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the sequential evaluation.   First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 1, 2005   (Tr. 22-23). At step two, the ALJ found that Plaintiff suffered from the following severe impairments:   1) history of neuropathy; 2) pain in multiple joints; 3) side-effects of infertility treatment procedures; and 4) daily cigarette smoking (Tr. 23).   However, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1   (Tr. 23).   Based on the medical record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with limitations (Tr. 23).

3

The ALJ then proceeded with step four of her analysis and determined that Plaintiff was able to perform her past relevant work as a substance abuse counselor and as a payroll clerk (Tr. 26-27). This determination was supported by the testimony of a vocational expert ("VE") (Tr. 27). Based on these findings, the ALJ determined that Plaintiff was not under a disability at any time through the date of her decision (Tr. 27-28). These determinations were supported by substantial evidence, a summary of which now follows.

The medical evidence includes treatment records prior to the alleged onset date which show treatment for, among other things: 1) sinusitis; 2) bronchitis; 3) non-strep pharyngitis; 4) sinus headache; 5) an upper respiratory infection; 6) viral syndrome; and 7) dermatitis (Tr. 240-251, 356-369, 638-649, 686-691). In April 2003, Plaintiff complained of fatigue, nausea, and depression (Tr. 257, 627). Laboratory results showed elevated levels of white blood cells and ruled out mononucleosis but no diagnosis was noted in the record (Tr. 257-59, 627-29). Laboratory results in September 2005 showed elevated cholesterol levels but no other abnormal values (Tr. 271-72, 602-05). Plaintiff also received treatment related to infertility and in vitro fertilization. (Tr. 271-275, 319-322, 371-376, 452-463, 602-625, 667-701).

On October 1, 2005, Plaintiff underwent an in vitro fertilization procedure (Tr. 375-77, 620, 698). Plaintiff later reported that each time she had intrauterine insemination she: 1) experienced intense pain two to three days later which rendered her unable to move from her bed; and 2) would feel sick again two to three weeks later (Tr. 370). The latter symptoms included fatigue and aching in her hands, feet, and lower back (Tr. 370). In an undated letter written to her doctors, Plaintiff asserts that her previous physician "lied to [her], refused to do anything or even admit [she] had an infection and wasn't listening to her" (Tr. 370). Laboratory testing of Plaintiff's reproductive immunology showed elevated natural killer cell activation and

4

reproductive immunophenotype abnormalities (Tr. 266-67, 600-01). On October 24, 2005, Plaintiff underwent further testing and was prescribed a 14 day course of antibiotics (Tr. 693). The testing was negative for mycoplasma hominis and ureaplasma urealyticum (Tr. 599). Ultimately, Plaintiff was assessed as possibly having reactive arthritis and was referred to a rheumatologist (Tr. 464). However, further laboratory testing did not confirm this diagnosis (Tr. 270, 598).

Dr. Elise Carlson examined Plaintiff on November 10, 2005 (Tr. 277-278). During this examination, Plaintiff stated that she was in good health until she began her fertility treatments (Tr. 277). Approximately two weeks after each intrauterine insemination treatment, Plaintiff would suffer from episodes of severe joint pain and stiffness in her back, hands, and feet (Tr. 277). Plaintiff also experienced: 1) apathy; 2) flu-like symptoms; and 3) frequent drenching sweats without fevers (Tr. 277). In addition, Plaintiff would intermittently experience migraine headaches and rashes involving the lower extremities (Tr. 277). These symptoms would last for several days and then improve (Tr. 277). When she stopped her infertility treatments, her symptoms improved (Tr. 277). During this examination, her October 2005 symptoms were described as "mild cramps" rather than "intense pain" (Tr. 277). A review of Plaintiff's systems was generally unremarkable and her physical examination was normal (Tr. 278). Dr. Carlson did not provide a specific diagnosis, but rather only observed that "[a] question of reactive arthritis has been raised" (Tr. 278). Plaintiff was asked to return when she had a recurrent flare so that her joint symptoms could be observed (Tr. 278).

Laboratory testing was performed in December 2005 at the request of Dr. David Lobo (Tr. 280-287). Various tests to detect Lyme disease were either indeterminate or negative (Tr. 280-284). An Epstein-Barr virus panel was suggestive of a past Epstein-Barr virus infection (Tr.

281).   All other laboratory values were within normal range (Tr. 280-287).

On December 24, 2005, Plaintiff sought treatment for neck and back pain the day after a motor vehicle accident and was diagnosed with multiple muscle strains in the neck and low back (Tr. 239, 355, 470, 637, 685). X-rays of the cervical and lumbar spine in January 2006, showed reversal of the normal cervical lordosis and lumbar scoliosis but were otherwise normal (Tr. 588-589, 670-671). An MRI of the brain on January 12, 2006, was normal (Tr. 288, 378, 471, 586-87).

Plaintiff was examined by Dr. David B. Walshin on January 24, 2006 (Tr. 300-09, 674-79).   Dr. Walshin indicated that Plaintiff's usual state of health was "stable" and "relatively good" (Tr. 300).   On examination, Plaintiff's gait was grossly normal.   There was mild tenderness to palpation over the lower cervical paraspinal muscles.   In addition, Plaintiff had reduced range of motion, mild tenderness to palpation at the L5-S1 junction, as well as pain with range of motion (Tr. 303-304, 677-78). Dr. Walshin diagnosed Plaintiff with:  1) cervical and lumbar strain/sprain injuries; 2) mild degenerative disc disease at L4-L5 and L5-S1; 3) and lumbar scoliosis (Tr. 300-01, 304, 674-75, 678). Dr. Walshin prescribed physical therapy and Voltaren (Tr. 304, 678-79).   Plaintiff underwent physical therapy from January 25, 2006, to March 1, 2006 (Tr. 293-99, 305, 702-709).

Dr. Gerald B. Weiss examined Plaintiff on February 8, 2006.   Plaintiff complained of:  1) intermittent lower back pain; 2) frequent urinary tract infections; and 3) episodes of sinusitis and bronchitis.   Plaintiff also noted that after artificial insemination she suffered from:  1) chills; 2) dry heaves; 3) nausea; 4) burning sensation in her legs, feet, and abdomen; and 5) profound loss of energy (Tr. 405-07, 481-83, 742-44).   During a February 17, 2006 follow up, Plaintiff reported: 1) constant pain of varying severity in her palms and the soles of her feet; 2) intermittent nausea; and 3) increased forgetfulness, including word finding difficulty (Tr. 404, 485, 741).   Upon

6

examination, Plaintiff demonstrated: 1) tenderness to palpation along the spine; 2) decreased sensation to pinprick in the right L5-S1 distribution and along the right arm and forearm; and 3) decreased coordination on the right side (Tr. 404, 485, 741). However, Plaintiff demonstrated full motor strength (Tr. 404). Dr. Weiss diagnosed Plaintiff with probable chronic Lyme disease and/or associated co-infections, possible Bartonella co-infection, and possible painful degenerative disc disease or other spinal condition (Tr. 550). A laboratory report dated February 22, 2006, showed a low level of CD57 lymphocytes (Tr. 347, 445, 525). Laboratory reports dated February 24, 2006 and February 28, 2006 did not show any abnormalities (Tr. 521-526).

On March 1, 2006, Dr. Walshin examined Plaintiff again (Tr. 311, 672). Dr. Walshin's ultimate assessment was that Plaintiff's neck and low back pain were improving (Tr. 311, 672).

Laboratory reports dated March 1, 2006 and March 2, 2006 did not show any abnormalities (Tr. 433-584) On March 2, 2006, Plaintiff underwent cerebral SPECT imaging which showed a left temporal lobe perfusion defect (Tr. 318, 499, 512, 545, 559, 682). A laboratory report dated March 8, 2006 showed the results of Lyme disease testing as either negative or indeterminate (Tr. 487-569). Various other tests were also negative. *Id.* A laboratory report dated March 13, 2006 reported negative findings for Lyme-related bacteria, but did note some abnormal findings related to Epstein-Barr virus antibodies, herpes simplex virus antibodies, and human herpesvirus antibodies (Tr. 495-562). An MRI of the lumbar and cervical spine on March 22, 2006, showed no abnormalities of the spine, although the cervical MRI showed non-pathologically enlarged cervical lymph nodes (Tr. 316-317, 516, 546-547, 557-58, 681).

Plaintiff was examined by Dr. Walshin on March 24, 2006 (Tr. 310, 673). During this examination, Plaintiff stated that she was "not doing good" (Tr. 310, 673). Dr. Walshin noted that Plaintiff had not attended any physical therapy since March 1, 2006 (Tr. 310, 673). According to

7

Plaintiff, she felt much better when she regularly attended physical therapy (Tr. 310, 673). Ultimately, Plaintiff was diagnosed with "[s]light worsening of neck and low back pain, in part due to reduced physical therapy frequency to attend to medical illness" (Tr. 310, 673). On March 28, 2006, Plaintiff reported three years of chronic nausea with increased severity over the past week (Tr. 400-401, 477, 738). Dr. Weiss noted that Plaintiff had been on a course of doxycycline for the past five days during which Plaintiff experienced: 1) fatigue; 2) loss of energy; 3) increased neck and low back pain; 4) bilateral jaw pain; and 5) hot flashes. Dr. Weiss opined that this was likely a likely a Herxheimer reaction (Tr. 401, 477, 738). Plaintiff was diagnosed with late disseminated Lyme disease and probable Bartonella co-infection (Tr. 402). She was prescribed prescribed magnesium supplements, Reishi for immune support, continued doxycycline, and Reglan for nausea (Tr. 402, 478, 739). On April 11, 2006, Plaintiff reported that her nausea had improved (Tr. 400). However, she still experienced fatigue and episodes of severe pain approximately three times a week lasting approximately 12 hours (Tr. 400, 476, 737). On examination, Dr. Weiss noted that Plaintiff had full motor strength in all major muscle groups, intact coordination, and no ataxia in her gait (Tr. 400, 476). Dr. Weiss prescribed medications including Oxycodone and another cycle of doxycycline (Tr. 400, 476). A laboratory report dated May 3, 2006, showed negative findings for Lyme disease (Tr. 427-30). Plaintiff returned to Dr. Weiss on May 4, 2006. She reported improvement in most of her symptoms (Tr. 399, 736). On follow-up on June 1, 2006, Plaintiff reported daily episodes of "tingling" as well as increased severity of pain in her neck, lower back, both knees, and hands and feet for the past ten days. Dr. Weiss opined this was likely due to rainy, damp weather (Tr. 398, 735). Plaintiff also reported that on and off for the past two years she would drop objects out of either hand and this had started again in the past two weeks (Tr. 398, 735). Dr. Weiss adjusted the dosages of her medications and

8

started her on new medications, including Lyrica (Tr. 398, 735).

On May 17, 2006, Dr. Katherine Tracy evaluated Plaintiff's RFC (Tr. 333-340). It was determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk (with normal breaks) for a total of at least two hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday; and 5) push and/or pull with no limitations other than as shown for lifting and carrying (Tr. 334). It was noted that Plaintiff could never climb ladders, ropes and scaffolds, although she could occasionally climb ramps and stairs (Tr. 335) . Likewise, Plaintiff was deemed capable of occasionally balancing, stooping, kneeling, crouching and crawling (Tr. 335). No manipulative, visual, communicative, or environmental limitations were noted (Tr. 336-337). On November 13, 2006, this assessment was affirmed by Dr. Virginia H. Rittner (Tr. 434).

A nerve conduction study of the upper extremities on June 8, 2006, showed evidence of left median sensory axonal neuropathy, but no evidence of large fibre peripheral polyneuropathy (Tr. 341- 43). A nerve conduction study of the lower extremities on June 9, 2006, was normal (Tr. 344-46). Laboratory reports at the end of June 2006 did not show any abnormalities (Tr. 420-26).

Plaintiff returned to Dr. Weiss on June 29, 2006, and reported a worsening of her symptoms, including severe migraine headaches (Tr. 397, 733). Dr. Weiss discontinued Plaintiff's Doxycyclin and started her on Minocin (Tr. 396, 734).

On July 13, 2006, Plaintiff began treatment with Dr. Arthur F. Blake (Tr. 442-43). Plaintiff described a history of fevers and fatigue since 1981, and intermittently not feeling well since 1999 (Tr. 442). Plaintiff reported that for the past few years she had migraine headaches, neck and low back ache, eye pain, aches in her hands and feet, no energy, dizziness, and stuttering. She also indicated that she would drop things (Tr. 442). Dr. Blake noted that Plaintiff

9

appeared anxious and depressed, but had a very good affect, normal speech and thought, and no ideas of reference, flight of ideas, or delusions (Tr. 443). He also observed that Plaintiff walked with an antalgic gait favoring her left hip (Tr. 443). Dr. Blake assessed Plaintiff's condition as "virtually certain to be CNS [central nervous system] Lyme disease" with possibly Bartonella or mycoplasma infection (Tr. 443). Dr. Blake prescribed a course of intravenous treatment with Rocephin four days a week (Tr. 443).

A pathology report dated July 26, 2006, reported that biopsy skin samples from the right thigh and calf showed significantly reduced epidermal nerve fiber density, consistent with small fiber neuropathy (Tr. 351-52). On July 27, 2006, Plaintiff reported increased severity of daytime fatigue and loss of energy; increased severity of intermittent weakness in both arms and legs; nausea with rapid body positioning, driving, and eating; severe pain in her right ankle with swelling that had resolved; eye pain; and cognitive dysfunction (Tr. 396, 734). On August 15, 2006, Plaintiff began receiving intravenous Rocephin through a midline catheter, scheduled to continue regularly four days per week, and a four-day course of intravenous IgG (immunoglobulin G or gamma globulin) treatment, with a plan to continue such treatment four days per month (Tr. 394).

Dr. Weiss examined Plaintiff again on August 24, 2006. During this examination, Plaintiff reported: 1) severe daytime fatigue and loss of energy; 2) severe throbbing pain in both hands and feet with associated hypersensitivity to tactile pressure and stimuli; 3) intermittent moderately severe neck and lower back pain made worse by sitting and performing household chores and eased by lying supine; 4) bilateral eye and upper eyelid pain characterized as a burning and irritated sensation; 5) occasional headaches; 6) difficulty with concentration and focusing on specific tasks; 7) an itching and burning sensation in the vaginal area; and 8) urinary frequency and

10

urgency (Tr. 394, 731). Laboratory reports at the end of August 2006 showed some out of range values (Tr. 416- 419).

On September 5, 2006, Plaintiff had a follow-up appointment with Dr. Blake (Tr. 441). She reported that she was not feeling well that day and had a rash on her hands (Tr. 441). Dr. Blake noted that she was being treated with intravenous Rocephin, but that the midline catheter had failed and she required a new intravenous port (Tr. 441). Dr. Blake noted that Plaintiff had felt better, but was now back to how she felt at the start of her treatment (Tr. 441).

Plaintiff was examined by Dr. Abraham Mintz on September 15, 2006 (Tr. 373-374). Her chief complaint was neck and back pain (Tr. 373). A review of her systems was unremarkable (Tr. 373). Upon examination, she appeared to be quite uncomfortable (Tr. 373). Her range of motion of the cervical spine was limited secondary to posterior cervical muscle spasms (Tr. 373). She had full strength in her upper extremities, although this was limited by her pain (Tr. 373). Plaintiff had difficulty completing the strength tests for her lower extremities due to low back pain (Tr. 373). In addition, Plaintiff's gait was antalgic and she reported occasional numbness in her hands (Tr. 373). An MRI of Plaintiff's cervical, thoracic and lumbar spine did not demonstrate any herniations or nerve root impingement (Tr. 373). Ultimately, Plaintiff was diagnosed with chronic low back pain that did not require surgical treatment (Tr. 373).

On September 21, 2006, Plaintiff was re-examined by Dr. Weiss (Tr. 393, 730). Plaintiff reported that she had completed a second course of intravenous IgG therapy and four weeks of intravenous Rocephin therapy before having difficulty with the midline catheter (Tr. 393, 730). Plaintiff reported severe daytime fatigue and loss of energy; bilateral hand and foot pain made worse with standing and walking; pain in her neck and lower back; visual hallucinations in her right peripheral visual field; tender points in the lower legs; and severe pain three out of the past

11

four weeks (Tr. 393, 730). Dr. Weiss prescribed several medications, including Oxycodone (Tr. 393, 730). Laboratory reports from September 2006 and early October 2006 showed low levels of CD57 lymphocytes but all other values were within normal ranges (Tr. 409-415).

Plaintiff was examined again by Dr. Blake on October 10, 2006. (Tr. 440). During this examination it was observed that Plaintiff was "feeling better" (Tr. 440). Dr. Blake noted that Plaintiff had been receiving intravenous Rocephin treatment once again for three weeks and that she was less tired and in less pain (Tr. 440). Her Lyme disease was described as improving (Tr. 440). Likewise, on October 18, 2006, Plaintiff reported to Dr. Weiss that her condition was improving (Tr. 392). Specifically, Plaintiff reported that she had 40 percent good days and 60 percent bad days, as opposed to 99 percent bad days prior to February 2006 (Tr. 392, 729). Plaintiff described good days as having enough energy and increased motivation to engage in daily activities such as bathing, getting dressed, grocery shopping, cooking, doing laundry, doing paperwork, and helping her daughter with schoolwork (Tr. 392, 729).

Dr. Blake examined Plaintiff again on November 14, 2006 (Tr. 439). Plaintiff reported feeling "pretty good" (Tr. 439). She specifically indicated that her "bad spells" were shorter (Tr. 439). However, Plaintiff also indicated that her eyes still bothered her; she had intermittent jaw pain but with some improvement; continued difficulties with memory; occasional stuttering; minor headaches , and periods of depression lasting one day a month (Tr. 439). On mental status exam, Plaintiff's recent and remote memory were intact and her mood was neutral (Tr. 439).

On November 21, 2006, Plaintiff was examined again by Dr. Weiss (Tr. 727). Plaintiff reported difficulty falling asleep, but being able to sleep eight hours; no change in her pain levels; continued fatigue and low energy; and transient episodes of depressed mood three or four times a month (Tr. 727).

12

Laboratory reports dated November 15 and 23, 2006, showed some abnormal results (Tr. 448-451), however, reports dated December 7, 2006 were normal (Tr. 446-447).

Plaintiff informed Dr. Blake on December 12, 2006, that she was "not doing well" (Tr. 438). On mental status examination, her mood was down and her affect fair (Tr. 438). Dr. Blake assessed Plaintiff with "prob. chronic fatigue syndrome" (Tr. 438).

Dr. Weiss examined Plaintiff again on December 19, 2006 (Tr. 725). Plaintiff reported that three weeks prior she had a sore throat, a scratchy and hoarse voice, bilateral eye pain, loss of energy and daytime fatigue dizziness, general weakness, and daily episodes of pain in both ankles and hands associated with transient hypersensitivity to tactile pressure and stimuli in the hands and feet (Tr. 725-726). On January 18, 2007, Plaintiff reported that her medication was partially relieving pain (Tr. 723). Dr. Weiss also noted that Plaintiff's mental clarity was greatly improved with Levaquin treatment (Tr. 724). Specifically, Plaintiff had an increased ability to focus and sustain attention, decreased forgetfulness, and decreased frequency of letter and word reversals (Tr. 724). On February 26, 2007, Plaintiff reported intermittent prolonged episodes of bilateral knee pain with associated swelling. She also experienced similar, but less intense pain, in her elbows, and a 10-15 minute episode of burning pain in her hips (Tr. 722). Plaintiff also reported a recurrence of daytime fatigue and loss of energy, decreased mental clarity, and increased forgetfulness (Tr. 722). However, on March 28, 2007, Plaintiff indicated that she had normal energy levels and her insomnia and cognitive difficulties had resolved (Tr. 720). Nonetheless, Plaintiff reported continued pain in her lower back, elbows, knees, hands and feet. She also experienced swelling in her knees. (Tr. 720). Plaintiff was reported as having completed intravenous IgG therapy and her listed medication included Oxycontin, Oxycodone, and Bicillin (Tr. 721). On April 29, 2007, Plaintiff reported that she had felt great for one week, but then had

13

a return of daytime fatigue, loss of energy, pain symptoms, and cognitive dysfunction (Tr. 720).

Plaintiff reported a ten-day history of morning episodes of cold sweats with nausea, fatigue, and a

burning sensation in her skin lasting two to three hours (Tr. 720).    On May 22, 2007, Plaintiff

reported resolution of her cold sweats and decreased burning sensation in her skin with

medication, but also reported increased insomnia, numbness in her arms and thighs when lying in

bed and in the early morning, severe headaches, and continued pain in her elbows and knees (Tr.

719).   Plaintiff reported that she was at about 80 to 90 percent normal six days per month, about

12 days a month were "bad" or about half as good as during the six day period, and 12 days a

month were "horrible," although not as bad as before she started treatment (Tr. 719).   On June 19,

2007, Plaintiff reported improved energy levels and that she had gone grocery shopping, drove her

daughter to school, went on a walk with her daughter, took her daughter shopping, and visited her

brother in New York city (Tr. 718).    However, Plaintiff also reported occasional transient visual

and auditory hallucinations and mild myalgias and arthralgias in her hands, feet, elbows, and knees

(Tr. 718).   On July 25, 2007, Plaintiff reported that she had been doing well until July 7, but that

since then she had a progressive worsening of her symptoms (Tr. 716).   Conversely, Plaintiff

reported on September 25, 2007 increased energy levels with associated increased functional

capabilities (Tr. 714). After riding a train to Florida in October, 2007, Plaintiff indicated that she

had three weeks of increased stiffness in her back, pain in her legs and lower back, and was unable

to bend forward (Tr. 713). Plaintiff reported that similar symptoms recurred two days prior to the

appointment after doing various household chores (Tr. 713). Plaintiff reported moderate to severe

daytime fatigue and loss of energy as well as intermittent numbness in her fingers two or three

times a day (Tr. 713). On November 19, 2007, Plaintiff reported intermittent pain in the soles of

both feet and in her ankles brought on with standing and walking over the previous ten days;

intermittent moderate severity pain in her wrists, elbow, knees, and ankles brought on with cold, damp weather; increased urinary frequency; intermittent abnormal temperature sensitivities with an associated burning sensation in her hands and feet; moderate to severe daytime fatigue and loss of energy; and intermittent short-term memory loss, increased forgetfulness, and geographical disorientation (Tr. 711-12). On December 21, 2007, Plaintiff reported severe daytime fatigue and loss of energy, a sensation of heaviness in her extremities, and occasional visual hallucinations (Tr. 711).

A laboratory report dated January 8, 2008, did not show any abnormal values (Tr. 787-790).

On January 23, 2008, Plaintiff reported that for about three weeks she had increased energy levels and no headaches or other symptoms, but that two days prior to the appointment she developed headaches, jaw pain, sore throat, severe daytime fatigue and exhaustion, pain in her hands, wrists, elbows, neck, lower back, knees, and ankles, and hypersensitivity to tactile stimuli in the soles of her feet, the top of her toes, and in her hands (Tr. 710).

In an undated letter, Dr. Weiss indicated that Plaintiff had been diagnosed with the following conditions: 1) chronic lyme disease and associated coinfections; 2) small fibre peripheral neuropathy; and 3) left median sensory large fibre axonal neuropathy (Tr. 746). He also noted that Plaintiff's "prognosis for a complete clinical cure is very poor" (Tr. 746). Specifically, Dr. Weiss opined that Plaintiff will likely "require long-term treatment with allopathic, naturopathic, and or complementary methods" (Tr. 746).

During the hearing in this matter, Plaintiff testified that she stopped working because she was unable to focus and concentrate and because of weakness. This weakness caused her to frequently arrive late or call out sick. She also required naps during the day (Tr. 35-36).

15

Eventually Plaintiff was diagnosed with Lyme disease and treated with antibiotics, pain killers, and various other medications (Tr. 37-39). Plaintiff testified that she also suffered from: 1) chronic fatigue; 2) neuropathy with intermittent symptoms of tingling, numbness and hypersensitivity; 3) small fiber neuropathy which caused pain in her knees, and sometimes as far up her legs as her thighs, and pain from her hands to her elbows, and sometimes as far up her arms as her shoulders; and 4) episodes of nausea (Tr. 39-53). Her symptoms were affected by cold, humidity, rain, and snow (Tr. 46, 53-54). According to Plaintiff, her medications helped. For example, her neuropathy symptoms had returned after discontinuing intravenous immunoglobulin treatment (Tr. 42. 52). She estimated that on average she had three days a week during which she was physically able to get out of bed and the rest of the time stayed in bed (Tr. 50-51). With regard to daily activities, Plaintiff testified that on good days she was able to bathe, check messages and emails, manage health care appointments and insurance issues, run errands, go shopping, cook, and do some vacuuming and light cleaning (Tr. 41-42, 55). Plaintiff testified that she lived with her husband and two children, but that it was difficult to get help from her husband because he is disabled and that she relied on help from her mother, who would come and stay for a while (Tr. 47). Plaintiff smokes between seven cigarettes and an entire pack per day (Tr. 45). Plaintiff testified that activity aggravated her neck, back, knees, elbows, hands and feet and that she became easily worn out if she did too much (Tr. 42, 54). With regard to travel, Plaintiff asserted that since she stopped working she had driven to her parents' home in North Carolina five times, for about three weeks at a time and that she stopped at her sister's home in Virginia on the way until she had energy to continue her trip (Tr. 44-45, 55). Plaintiff noted that she also visited her brother in Manhattan about twice a year (Tr. 44). With regard to her limitations, Plaintiff alleged that she had pain and weakness when walking and that she sometimes lost her balance (Tr.

16

48). She indicated that was unable to stand when she had pain in her ankles and in the soles of her feet and had difficulty standing when she did not have energy (Tr. 48, 53). Likewise, sitting up was draining and sitting also aggravated her neuropathy (Tr. 53). When she had enough energy, Plaintiff stated that she was able to lift 20 pounds (Tr. 48).

The ALJ made the following findings with regard to Plaintiff's credibility and ultimate RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work within these parameters: No lifting overhead, all postural activities allowed on an occasional basis, avoid extremes of temperature and humidity, and avoid operating hazardous equipment (other than driving) . . .
>
> In the past two years, the claimant has reported a variety of short-term and either intermittent or chronic symptoms. Those symptoms include joint pain in differing parts of her body, headaches, fatigue, side-effects of infertility treatment, and flu-like symptoms. She has not required any surgery, nor has any inpatient hospital care been needed. She has sometimes taken pain-control or infection control medications, but not at a frequency or level to prevent sedentary work. Her concentration, memory and interpersonal relationships are adequate or better. See for example the articulate letters she wrote to New Haven Rheumatology to request medical records (Exhibit 5F). A key medical goal has been to achieve a second pregnancy, following her marriage to her current husband over five years ago. Understandably, this is a time-consuming and costly process, and she has consulted many medical sources. A related goal was to explore whether the infertility treatments were causing medical side-effects (so they might have to be stopped or changed,) or other disease was in play.
>
> Dr. Carlson's summary of the claimant's medical history, medications, side-effects and physical ranges of motion does not support the level of disability alleged at the 2008 hearing (Exhibit 5F). She has seen Dr. Weiss numerous times in the period at issue. His progress notes, medication records and recommendations do not support the level of disability alleged (Exhibits 15F and following.) Many of her symptoms are migratory and subjective, rather than involving demonstrated loss of range of motion or strength. Her complaints of fatigue are noted but not associated with any specific medical impairments to be expected to result in disabling fatigue.
>
> The limitation to sedentary exertion, in this decision, gives the claimant the

17

benefit of the doubt in light of all testimonial and written evidence. The Commissioner of the Social Security Administration has reserved authority to make the residual functional capacity finding, among other dispositive findings (Social Security Ruling 96-5p.) That authority is delegated to each Administrative Law Judge. Findings of disability cannot be supported by subjective symptoms alone, when the diagnoses reported by treating sources are so limited.

The claimant reported that her current medications, in 2007-2008, are prescribed by Gerald Weiss, M.D. (Exhibit 20E). Dr. Weiss's letterhead states he is board-certified in psychiatry and neurology, and in pain medicine (Exhibit 15F). He interpreted her June 2006 EMG study (over one year after the alleged onset month of January 2005) to show; left median sensory axonal neuropathy and "no (EMG) ...evidence of a generalized large fibre peripheral polyneuropathy" (Exhibit 15F, p. 13.) Hence, these diagnoses are incorporated into the findings of this decision.

Dr. Weiss' progress notes describe a wide range of subjective symptoms involving numerous joints, pain sites, and fatigue. At various times from 2006 through early 2008, her complaints included: pain in feet, knees, hands, eyelids, and occasionally her lower back; fatigue; difficulty grasping the steering wheel and other objects; swelling in multiple joints; and even occasional visual hallucinations. She reported side-effects, occasionally, of stronger pain medicines such as Oxycodone, but requested a renewal of some prescriptions. He ordered various blood tests such as HIV infection studies, which were generally negative (Exhibits 15F, 15F, 22F and 32F.) As a whole, his progress notes show many office visits and medications tried, but not the types of diagnoses to support total disability, under the Act, for a two-year period as alleged.

Medications prescribed by Dr. Weiss as of early 2008, according to the claimant, include a weekly injection of Bicillin. Also, there are oral medications, on a daily basis, which include Malarone, Azithromycin, Omacor capsules, and Ambien (10 mg.), (Exhibit 20E). She explained these medications are to assist her with viral immunity, infections, cholesterol control and to sleep better. After review of treatment records and testimonial evidence, the undersigned Administrative Law Judge finds that these medications do not prevent her from sustaining the attention span and concentration to sustain work activities. Her acknowledged activities in and outside her home show that she can pay attention, operate a car, read, etc.

The State Agency assessments must also be given a degree of weight and do not support disability from the claimant's past relevant work. While she did skilled or semi-skilled work as a payroll clerk and counselor, her articulate letters and testimony, and her overall course of treatment, do not show

mental limitations from such work. Dr. Weiss is certified in psychiatry and pain-control treatment, and he has not described the claimant as having either depression, cognitive deterioration, or serious anxiety.

Furthermore, the claimant concedes that she remains quite mobile. She travels out-of-state several times per years to visit family members (testimony). Destinations have included Manhattan, Virginia and North Carolina. She asserts she rests in one family member's out-of-state before traveling to the next state. This testimony was not a convincing explanation of her remaining out of work for over two years. In the recent winter, she testified she took five such out-of-state trips, which contradicts an allegation of disabling pain in many joints, and of fatigue. She does not take a high level of pain control medications. She asserts she has difficulty in standing, sitting up, and in her balance (testimony). Notes of the State Agency physicians, and all treating sources, do not provide any medical basis to make such restrictions in her work activity.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments are mild, and that her testimony concerning the intensity, persistence and limiting effects of these symptoms are not credible.

The claimant alleges that daily fatigue and pain in multiple joints limit her activities. Hypothetically, it could be argued such factors might reduce attention span or concentration, such as to perform skilled work such as counseling. However, the treatment record, diagnostic test results, level of medications prescribed and other factors specified in the regulations, do not support such a restriction upon performing work, for this claimant. She has undergone extensive diagnostic testing. She has not required any joint surgery. She is treated as an outpatient. A weekly medication injection does not, by itself, prevent an individual from working full-time. Administrative notice is taken that many individuals work who medically need daily or weekly injections, or outpatient treatments, for allergies, diabetes, infection control or other reasons.

While the claimant does not necessarily assert a diagnosis of chronic fatigue syndrome, Ruling 99-2p on that disorder provides guidance on the need to assess such symptoms at all sequential steps. In this case, it is the claimant's testimony that pain in multiple joints, fatigue, and many other medical problems have prevented her from performing even sedentary work for over 27 months, i.e., since October 2005. The mild to moderate findings, including EMG, x-ray and blood tests, of several physicians, including Dr. Weiss, do not show that level of dysfunction for so long a period.

A degree of weight is given in this assessment ofthe claimant's residual

19

functional capacity (RFC) to the State Agency physicians' detailed explanations (Ruling 96-6p). In November 2006, State Agency consultant Virginia Rittner, M.D., had access to numerous outpatient treatment records. Records cited by Dr. Rittner included reports by Dr. Weiss, the pain specialist. Dr. Rittner noted that the claimant's combined conditions did not prevent sedentary duties during the period at issue (Exhibit 23F). On that basis, the vocational analyst for the State Agency concluded, at step five, that sedentary jobs exist within the claimant's medical limitations.

This decision does incorporate several restrictions in the claimant's residual functional capacity to take into account her combined impairments. She is not expected to lift and carryover ten pounds, nor to walk and stand for a full work day, in these findings. The above finding also places a limit on most postural activities to "occasional," such as kneeling, crouching, crawling, and climbing. Also, operating dangerous machinery is limited as a precaution, as well.

With all those limits, the sedentary job base is still substantial as explained in the testimonial and written vocational evidence of record.

In sum, the above residual functional capacity assessment is supported by the State Agency detailed RFC estimates of two different physicians, plus the limited diagnostic study results. The claimant acknowledges sedentary and light activities in and outside her home, including occasional driving. Her assertion that she needs to spend many days per month in bedrest is not supported by the types of disorders diagnosed in her treating source reports.

(Tr. 23-26).

Finally a VE testified that, based on this record, Plaintiff could return to her past relevant work (Tr. 57).

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for her resolutions of conflicts in the evidence. Plaintiff's argument relies primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may

disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, her claims are without merit. The undersigned will nonetheless address portions of Plaintiff's specific assignments of error.

**The ALJ properly weighed the medical evidence**

Plaintiff asserts that "the ALJ refused to grant controlling weight to the medical evidence, primary and secondary diagnosis and opinions of her treating physicians" (DE-53, pg. 2). It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. Wireman v. Barnhart, 2006 WL 2565245 (Slip Op. at 8)(W.D.Va. 2006)(internal citations omitted). Furthermore, "while an ALJ may not reject medical evidence for no reason or the wrong reason . . .an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings." Id. (internal citations omitted).

While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a

21

medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209 (4ᵗʰ Cir. 1999) (unpublished opinion)(internal citations omitted).

Likewise, Plaintiff contends that the ALJ failed to take into account Plaintiff's impairments, including chronic fatigue syndrome, and ignored key symptoms in determining Plaintiff's RFC (DE-53, pg. 22). Plaintiff also argues that the ALJ did not properly consider Plaintiff's medical file, complaints, symptoms, or diagnoses and that therefore the RFC was based on errors of law and fact (DE-53, pg. 23, 27- 29). Specifically, Plaintiff asserts that the ALJ erred by not listing her chronic fatigue syndrome and Lyme disease as severe impairments. Plaintiff argues that the ALJ should have evaluated these impairments as directed by SSR 99-2p.

At the second step of the sequential evaluation process, the ALJ must determine if the claimant has one or more severe medically determinable impairments. 20 C.F.R. § 404.1520(4)(ii). However, if an ALJ fails to consider whether a specific impairment is severe at step two of the sequential evaluation, it is not reversible error provided the ALJ considers that impairment in subsequent steps.    Jones v. Astrue, 2009 WL 455414, *2 (E.D.N.C. Feb. 23, 2009) (citations omitted) (noting that the Court of Appeals for the Fourth Circuit has not address this question, but agreeing with the conclusion of other courts). *See also* Pittman v. Astrue,  2008 WL 4594574, *4 (E.D.N.C. Oct. 10, 2008) (finding that the ALJ's failure to set forth a specific finding as to the severity or non-severity of claimant's back impairment at step two was not reversible error since ALJ considered all of the claimant's impairments in formulating claimant's RFC). This is because, according to the regulations, upon finding that a claimant has at least one severe impairment, the ALJ must continue with the remaining steps in the sequential evaluation

and may properly consider a claimant's impairment in determining whether the claimant retains sufficient RFC to allow the claimant to perform substantial gainful activity. Even though the ALJ did not include Lyme disease or chronic fatigue syndrome as severe impairments at step two, the ALJ considered the other relevant symptoms related to these disorders and their effect on Plaintiff's ability to do work-related activities in determining the Plaintiff's RFC. In assessing Plaintiff's RFC, the ALJ considered all of Plaintiff's alleged symptoms, including those related to Lyme disease and/or chronic fatigue syndrome   (Tr. 23-26).

Moreover, the ALJ explicitly discussed chronic fatigue syndrome (Tr. 26).  Plaintiff alleges that the ALJ did not consider SSR 99-2p, but in fact the ALJ specifically referred to this Ruling in her decision (Tr. 26).   In addition, there is no concrete diagnosis in the medical evidence of chronic fatigue syndrome. Dr. Blake noted an assessment of "prob. chronic fatigue syndrome" (Tr. 438), but this brief notation is not definitive, and is at best evidence that Dr. Blake considered such a diagnosis possible or likely. Nevertheless, the ALJ considered Plaintiff's symptoms related to chronic fatigue syndrome and gave reasons for rejecting Plaintiff's assertion that she was unable to perform even sedentary work, citing the mild to moderate clinical and laboratory findings of several physicians which did not show this level of dysfunction (Tr. 26).

In her decision, the ALJ fully explained her reasoning in weighing the medical evidence. These reasons were supported by substantial evidence and, therefore, this assignment of error is meritless.

**The ALJ properly assessed Plaintiff's credibility**

Plaintiff also contends that the "ALJ incorrectly assessed  . . . [her] credibility without explanation" (DE-53, pg. 3).   .  The ALJ's findings with regard to Plaintiff's subjective complaints have already been summarized.  "Because he had the opportunity to observe the

demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively   v. Heckler,   739 F.2d 987, 989 (4th Cir. 1984).

Furthermore, the regulations provide a two-step process for evaluating a claimant's subjective complaints of pain or other symptoms. 20 C.F.R. § 404.1529; Craig , 76 F.3d at 593-96. First, the ALJ must determine whether there is objective medical evidence showing the existence of a medical impairment that could be reasonably expected to produce the pain or alleged symptoms. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594. Second, the ALJ evaluates the intensity and persistence of the symptoms to determine how they limit the capacity for work. 20 C.F.R. 404.1529(c); Craig, 76 F.3d at 595. The ALJ evaluates the intensity and persistence of the symptoms and the extent to which they limit a claimant's capacity for work in light of all the available evidence, including the objective medical evidence. 20 C.F.R. 404.1529(c). At the second step, however, claims of disabling symptoms may not be rejected solely because the available objective evidence does not substantiate the claimant's statements as to the severity and persistence of the symptoms. See Craig, 76 F.3d at 595. Since symptoms can sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, all other information about symptoms, including statements of the claimant, must be carefully considered in the second part of the evaluation. 20 C.F.R. 404.1529(c)(2).   The extent to which a claimant's statements about symptoms can be relied upon as probative evidence in determining whether the claimant is disabled depends on the credibility of the statements. SSR 96-7p, 1996 WL 374186, *4.

Here, the ALJ followed these standards in assessing Plaintiff's credibility.  The ALJ's findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing Plaintiff's credibility.  Likewise, the ALJ's citations to Plaintiff's

24

medical records constitute substantial evidence which support her assessment.   Accordingly, this assignments of error is meritless.

**Plaintiff's new evidence does not meet the prerequisites for remand**

Plaintiff also contends that "the ALJ and the Appeals Council refused to consider a majority of  . . . [her] medical file prior to the hearing and the new evidence which further supports consistencies in . . .[her] medical history, . . .symptoms, and credibility" (DE-53 pg. 3). After the hearing, Plaintiff submitted additional evidence to the Appeals Council (Tr. 2, 747-1008). While the Appeals Council considered some of this evidence, it found that the vast majority of the medical evidence related to a time after the ALJ's decision (Tr. 2-5). Plaintiff has also submitted 13 pages of additional evidence to this Court (DE 53-1).

A reviewing court cannot consider evidence which was not presented to the ALJ. <u>Smith v. Chater</u>, 99 F.3d 635, 638 n. 5 (4th  Cir. 1996).   However, a reviewing court may "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (sentence six). The Fourth Circuit has articulated four prerequisites that must be met before a reviewing court may remand a case to the Commissioner on the basis of new evidence. <u>Borders v. Heckler</u>, 777 F.2d 954, 955 (4th  Cir. 1985).   First, the evidence must be relevant to the determination of disability at the time the application was first filed and not merely cumulative; second, the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; third, there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and fourth, the claimant must present to the remanding court at least a general showing of the nature of the new evidence. *Id.*

(citations omitted). Implicitly, the "materiality" requirement also means that the evidence must relate to the claimant's condition prior to the rendering of the ALJ's decision. 20 C.F.R. § 404.970(b); Spencer v. Astrue, 2010 WL 1957360, at *4 (E.D.N.C. April 22, 2010).   In this case, the relevant time period extends from October 1, 2005 (Plaintiff's alleged disability onset date), to March 28, 2008 (the date of the ALJ's decision).

Virtually all of the medical evidence submitted to the Appeals Council subsequent to the hearing concerns medical care provided to Plaintiff after the ALJ's decision. The only new evidence relating to the relevant time period is a laboratory report dated January 8, 2008 (Tr. 787-90) which does not show any abnormalities and therefore would not change the outcome of the decision.

Similarly, the medical opinions in the later-submitted evidence (Tr. 980-82, 984) and submitted to this Court (DE 53-1) are dated after the date of decision and do not relate back to the adjudicated time period.    Accordingly, the new evidence does not meet the materiality requirement for remand under sentence six of § 405(g).

Regardless, to the extent the newly submitted evidence relates to the relevant time period, the ALJ's determination was still supported by substantial evidence.

**Conclusion**

For the reasons discussed above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-53) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-57) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Monday, March 14, 2011.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE